**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| MARY LU HARMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:20cv817 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social | ) | |
| Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND RECOMMENDATION</u> <u>OF UNITED STATES MAGISTRATE JUDGE</u>

Plaintiff, Mary Lu Harmon, brought this action under the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits. (Docket Entry 1.) The Court has before it the certified administrative record (cited herein as "Tr. __"), as well as the parties' cross-motions for judgment (Docket Entries 11, 14; <u>see also</u> Docket Entry 12 (Plaintiff's Memorandum); Docket Entry 15 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi should be substituted for Andrew M. Saul as the defendant in this suit. By reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), neither the Court nor the parties need take any further action to continue this suit.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI. (Tr. 258-77.) Upon denial of those applications initially (Tr. 163-73) and on reconsideration (Tr. 175-82, 187-96), she requested a hearing de novo before an Administrative Law Judge (the "ALJ") (see Tr. 197-213). Plaintiff, her attorney, and a vocational expert (the "VE") attended the hearing. (See Tr. 40-70.) The ALJ subsequently ruled Plaintiff not disabled under the Act. (Tr. 16-34.) The Appeals Council denied her request for review (Tr. 1-6), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] meets the insured status requirements of the . . . Act through September 30, 2023.

2. [Plaintiff] engaged in substantial gainful activity during the following periods: November 2017 through December 2018.

. . . .

3. However, there has been a continuous 12-month period(s) during which [Plaintiff] did not engage in substantial gainful activity. The remaining findings address the period(s) [Plaintiff] did not engage in substantial gainful activity.

4. [Plaintiff] has the following severe impairments: osteoarthritis, degenerative disc disease status post remote cervical discectomy, chronic kidney disease, and obesity.

. . . .

2

5. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . . .

6. . . . [Plaintiff] has the residual functional capacity [(at times, the "RFC")] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can frequently operate foot controls. She can frequently operate hand controls bilaterally. She can frequently push or pull with the right upper extremity. She can frequently reach overhead with the right upper extremity. She can frequently reach in all other directions with the right upper extremity. She can frequently handle with the bilateral upper extremities. She can frequently climb[] ramps or stairs. She can never climb ladders, ropes, or scaffolds. She can frequently balance, kneel, crouch, or crawl. She can occasionally stoop. She must avoid all exposure to unprotected heights and moving mechanical parts. She can occasionally be exposed to dust, odor, fumes, and pulmonary irritants in a work environment.

. . . .

7. [Plaintiff] is capable of performing past relevant work as a technical writer and operations research analyst.[2] This work does not require the performance of work-related activities precluded by [Plaintiff's RFC].

. . . .

8. [Plaintiff] has not been under a disability, as defined in the . . . Act, from November 30, 2017, through the date of this decision.

(Tr. 21-29 (bold font and parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v.

---

[2] Both positions qualify as sedentary, skilled work. (See Tr. 28.)

_Barnhart_, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." _Frady v. Harris_, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under this extremely limited review standard.

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." _Oppenheim v. Finch_, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." _Hines_, 453 F.3d at 561 (brackets and internal quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" _Hunter v. Sullivan_, 993 F.2d 31, 34 (4th Cir. 1992) (quoting _Richardson v. Perales_, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." _Mastro v. Apfel_, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." _Hunter_, 993 F.2d at 34 (internal quotation marks omitted).

4

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (brackets and internal quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the

---

[3] The "Act comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The [SSI] Program . . . provides benefits to indigent disabled persons. The (continued...)

adjudicative process, the Social Security Administration [(the "SSA")] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process (the "SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the

_____

[3] (...continued)
statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (citations omitted).

[4] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (citation omitted).

claimant is 'severely' disabled.  If not, benefits are denied."
Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at
each of the first three steps, "the claimant is disabled." Mastro,
270 F.3d at 177.  Alternatively, if a claimant clears steps one and
two, but falters at step three, i.e., "[i]f a claimant's impairment
is not sufficiently severe to equal or exceed a listed impairment,
the ALJ must assess the claimant's [RFC]." Id. at 179.[5]  Step four
then requires the ALJ to assess whether, based on that RFC, the
claimant can perform past relevant work; if so, the claimant does
not qualify as disabled.  See id. at 179-80.  However, if the
claimant establishes an inability to return to prior work, the
analysis proceeds to the fifth step, whereupon the ALJ must decide
"whether the claimant is able to perform other work considering
both . . . [the claimant's RFC] and [the claimant's] vocational
capabilities (age, education, and past work experience) to adjust
to a new job." Hall, 658 F.2d at 264-65.  If, at this step, the
Commissioner cannot carry its "evidentiary burden of proving that

---

[5]  The "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (emphasis and internal quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  The "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

7

[the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[6]

## B. Assignments of Error

Plaintiff asserts that the ALJ erred by (1) "appl[ying] an incorrect legal standard when she discounted [Plaintiff's] subjective complaints as inconsistent with the objective medical evidence" (Docket Entry 12 at 5 (bold and all-cap font omitted)); (2) "assessing [Plaintiff's RFC] pursuant to an incorrect framework and without explaining the RFC-related findings in the manner required by Social Security Regulations" (<u>id.</u> at 10 (bold and all-cap font omitted)); and (3) "fail[ing] to properly document the application of the special-technique assessment" (<u>id.</u> at 18 (bold and all-cap font omitted)). Defendant contends otherwise, asserting that "[t]he ALJ applied the correct law and relied on substantial evidence to find Plaintiff not disabled," and urges affirmation of the ALJ's decision. (Docket Entry 15 at 22.)

### 1. Subjective Complaints

In her first assignment of error, Plaintiff contends that, "like <i>Lewis</i>[ <i>v. Berryhill</i>, 858 F.3d 858 (4th Cir. 2017)], the ALJ's

---

[6] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant at step three does not terminate the analysis. <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

opinion should be vacated because she improperly increased [Plaintiff's] burden of proof by requiring objective proof of symptoms, and offered no record evidence supporting her conclusions that [Plaintiff's] symptoms were not credible." (Docket Entry 12 at 10 (citing Lewis, 858 F.3d at 869-70).) More specifically, Plaintiff argues that "the ALJ ignored Fourth Circuit precedent and the agency's rules and regulations, by disregarding [Plaintiff's] subjective complaints due a lack of objective evidence" (id. at 6) and that, "contrary to the ALJ's arguments, the objective medical evidence actually does support [Plaintiff's] subjective complaints in this case" (id. at 7-8). Plaintiff's arguments lack merit.

As the United States Court of Appeals for the Fourth Circuit has explained:

> An ALJ assesses the credibility of a claimant's subjective statements about his condition as part of the RFC assessment. When conducting the RFC assessment, the ALJ must consider all relevant evidence in the record, including medical records, reports of daily activities, and "effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." SSR 96-8p[, 1996 WL 374184] at *7[ (Jul. 2, 1996)]. When a claimant makes statements about his symptoms, the ALJ must determine the credibility of those statements and explain his assessment. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4); see SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996). . . .
>
> SSA regulations set out a two-step process that ALJs must follow when evaluating a claimant's subjective statements about his impairments and symptoms. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ considers the objective medical evidence to determine whether the claimant's medical impairments "could reasonably be expected to produce the pain or other symptoms alleged." Id. Second, the ALJ evaluates the "intensity and

9

persistence of [the claimant's] symptoms" and
"determin[es] the extent to which [those] symptoms limit
[the claimant's] capacity for work." *Id.* At the second
step, the ALJ must "assess the credibility of the
claimant's statements about symptoms and their functional
effects." *Lewis*[, 858 F.3d at 866] (citing 20 C.F.R.
§§ 404.1529(c)(4), 416.929(c)(4)). . . .

When an ALJ makes a credibility determination, he
must "consider the entire case record, including the
objective medical evidence, the individual's own
statements about symptoms, [and] statements . . . by
treating or examining physicians." SSR 96-7p at *1. In
this analysis, the ALJ must "build an accurate and
logical bridge from the evidence to his conclusion that
the claimant's testimony was not credible." *Brown v.
Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 269 (4th Cir.
2017) (internal quotations and alterations omitted).

Ladda v. Berryhill, 749 F. App'x 166, 170 (4th Cir. 2018) (final

ellipsis and certain brackets in original).

Here, contrary to Plaintiff's contentions, the ALJ did not

"increase [Plaintiff's] burden of proof by requiring objective

medical evidence in support of her symptoms" (Docket Entry 12 at

7). (See Tr. 25-28.) Rather, the ALJ determined that the

objective medical evidence, including Plaintiff's largely

conservative treatment history, her daily activities, the opinions

of medical examiners, and her substantial gainful activity and

receipt of unemployment during the relevant period undermined the

credibility of Plaintiff's statements regarding the intensity,

persistence, and limiting effects of her symptoms. (See Tr. 25-28;

see also Tr. 26 (finding that, although Plaintiff's "medically

determinable impairments could reasonably be expected to cause the

alleged symptoms[, her] statements concerning the intensity,

persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence <u>and other evidence in the record</u> for the reasons explained in this decision" (emphasis added).) The ALJ acted appropriately in considering such evidence. <u>See</u> 20 C.F.R. § 404.1529(c) (directing ALJs, when evaluating intensity, persistence, and limiting effects of claimant's symptoms, to assess, <u>inter alia</u>, objective medical evidence, medical opinions, daily activities, medication, and treatment other than medication).

For instance, the ALJ first discussed Plaintiff's description of her daily activities, which include preparing her own meals each day, "perform[ing] household chores, such as cleaning, laundry, and taking out the trash," driving, "shop[ping] for groceries and household items twice a week," singing in church choir on a weekly basis, attending church, having dinner with friends, talking on the telephone, and "stay[ing] connected on Facebook." (Tr. 26 (citing Ex. 4E).) The ALJ further noted that, per her own assessment, Plaintiff "can pay attention for an hour without problems and usually finishes what she starts" and also "follows instructions well" and "can walk a quarter of a mile before needing to rest for 15 minutes." (Tr. 26.) The ALJ also explained that "[Plaintiff] worked throughout the relevant period and continues to work part-time. She reported that one of her daily activities is to look for work." (Tr. 25.)

The ALJ then discussed Plaintiff's medical evidence, which included "unremarkable" physical exams, "[r]ecent labs indicat[ing] that her condition remains stable," use of only Acetaminophen for pain relief, "no evidence of any significant treatment for any spinal conditions other than two chiropractic visits in 2019," and a "grossly unremarkable" physical consultative examination. (Tr. 26-27.)

The ALJ also examined the medical opinion evidence, explaining that she found "persuasive" the opinions of Dr. Strobel-Nuss and Dr. Warren, the State Agency psychological consultants, which "opined that [Plaintiff] had no more than mild limitations in mental functioning and no severe mental impairments," and of Dr. Bessent and Dr. Linster, the State Agency medical consultants, which "opined that [Plaintiff] could perform a range of light work" (Tr. 27). (See Tr. 27-28.) The ALJ additionally discussed the reasons that she found other medical opinion evidence less persuasive than the State Agency opinions. (See Tr. 27-28.) Finally, the ALJ explained that Plaintiff's work history during the relevant period undermined her subjective assessment of her impairments. (See Tr. 27.) More specifically, the ALJ stated:

> Records indicate that [Plaintiff] worked at the level of substantial gainful activity for most of the relevant period and only stopped working when a contract would run out. When her contracts ran out, she immediately went on unemployment and held herself out as ready, willing, and

12

able to engage in gainful activity, which is also grossly contradictory to her allegations of disability.

(Tr. 27.)

Thus, rather than improperly increasing Plaintiff's burden of proof, the ALJ correctly considered the range of evidence in the record in finding that Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms lacked credibility. See Ladda, 749 F. App'x at 171-72.

Plaintiff contends, however, that the ALJ erred in her assessment of the objective medical evidence. (See Docket Entry 12 at 7-10.) In this regard, Plaintiff first asserts that "the medical evidence supports [Plaintiff's] subjective complaints because it shows she suffered from osteoarthritis, primarily of the right shoulder, that caused bilateral should[er] pain, for which she was given prednisone, recommended physical therapy, and referred to orthopedics." (Id. at 8; see also id. ("At the hearing, she testified that she had pain in both of her shoulders, and physical therapy was recommended, but she could not afford it.").) Yet, as the ALJ found, although "[r]ecords indicate complaints of bilateral shoulder pain" (Tr. 26 (citing Ex. 12F)),

> [p]hysical exams were unremarkable and indicated no tenderness, no crepitus, normal stability, and normal range of motion (12F p.3, 13F pp.7, 17, 15F pp.4-5, 17F pp.37, 53, 68). Muscle tone, bulk, and strength were normal and she had a normal gait (id.). One record indicated some reduced range of motion in the right shoulder (4F p.192). Imaging studies of the right shoulder indicated mild osteoarthritic degenerative change in the glenohumeral and acromioclavicular (AC)

13

> joints (*id.*).  The only medication she takes for pain
> relief is Acetaminophen (12F, 13F, 15F, 17F).

(Tr. 26.)  Moreover, Plaintiff's 2018 physical consultative examination "was grossly unremarkable" (Tr. 27), with Plaintiff experiencing "no palpable muscle spasms and [her] muscle strength and range of motion were normal throughout" (Tr. 27 (citing Ex. 5F pp.4, 6)).  The examination also indicated that Plaintiff was "able to lift, carry, handle, and manipulate light objects." (Tr. 27 (citing Ex. 5F p.5).)

Plaintiff next challenges the ALJ's findings regarding her kidney disease.  (See Docket Entry 12 at 8.)  In particular, Plaintiff disputes the ALJ's determination that Plaintiff's condition remained stable and criticizes the ALJ for "fail[ing] to mention that [Plaintiff] suffers from hyperthyroidism secondary to hypertensive chronic kidney disease, anemia associated with chronic renal failure, hyperlipidemia, and diabetes mellitus with renal complications." (Id. (citing Tr. 381, 385-86, 395).)  As a preliminary matter, Plaintiff did not identify "hyperthyroidism secondary to hypertensive chronic kidney disease, anemia associated with chronic renal failure, [or] hyperlipidemia" on her SSI application. (See Tr. 267.)  Rather, Plaintiff identified simply, inter alia, "Chronic Kidney Disease or Kidney Failure" and "Diabetes, unknown type." (Tr. 267.)

In any event, the ALJ addressed Plaintiff's "history of chronic kidney disease" (Tr. 26) and her diabetes (Tr. 23), in

14

addition to her hypertension and "mild vision loss" (Tr. 23), finding that the latter three impairments qualified as "non-severe" (Tr. 23).[7] Moreover, medical records, including the records that Plaintiff cites from Carolina Kidney Associates, repeatedly describe Plaintiff's kidney disease, anemia, hyperlipidemia, and diabetes as "controlled" or "stable." (See, e.g., Tr. 378, 381, 382, 386, 387, 391, 395, 670.) Further, as the ALJ observed, although Plaintiff experienced one brief hospitalization "for acute kidney injury" in 2019, she "recovered with approximately three days of observation and was discharged in stable condition" and "[r]ecent labs indicate that her condition remains stable. (Tr. 26 (citing Exs. 15F, 19F p.17); see Tr. 794-1034, 1129.)

Plaintiff next faults the ALJ for "fail[ing] to note that due to her diabetes with renal complications, [Plaintiff] suffered from diabetic retinopathy in her left eye" (Docket Entry 12 at 8 (citing Tr. 660)), which Plaintiff testified "caused blurry vision" (id.). The ALJ acknowledged, though, that Plaintiff suffered from "mild vision loss." (Tr. 23.) As, inter alia, Plaintiff's "[v]isual

_____

[7]  The State Agency opinions, which the ALJ found persuasive (see Tr. 27-28), also acknowledge Plaintiff's hypothyroidism, hyperlipidemia, anemia, eye problems, diabetes, and hypertension (see, e.g., Tr. 91, 97, 99, 104, 109-11, 113, 117, 129, 131, 133, 135-37), but nevertheless "opined that [Plaintiff] could perform a range of light work" and suffered from "no more than mild limitations in mental functioning and no severe mental impairments" (Tr. 27). Dr. Darji's physical consultive examination similarly recognizes Plaintiff's "diabetic retinopathy in the left eye" (Tr. 688), hypothyroidism (Tr. 689), and kidney disease (Tr. 688-89), but also notes that Plaintiff "[wa]s not experiencing any symptoms from [her chronic kidney disease]" (Tr. 688). Dr. Darji concluded that Plaintiff's diabetes, hypertension, eye problems, kidney problems, and assorted other ailments, including "depression, chronic pain in the shoulder, [and] osteoarthritis in the upper body," "are well controlled on current therapies and [are] not causing current functional limitations" (Tr. 694).

acuity with corrective lenses was 20/30 in each eye individually and 20/20 in both eyes," the ALJ found that this mild vision loss qualified as non-severe and "no more than minimally affect[s] Plaintiff's] ability to perform basic work related activities." (Tr. 23.) Plaintiff also takes issue with the ALJ's finding regarding the lack of "significant complaints of neck or back pain during the relevant period" (Docket Entry 12 at 9 (internal quotation marks omitted)), given the ALJ's failure to explicitly acknowledge that the doctor's note from Plaintiff's 2019 chiropractor visits "stated [that Plaintiff] was having 'a lot of low back pain.'" (Id. (quoting Tr. 762).) However, Plaintiff does not dispute that, as the ALJ found, "[t]here [we]re no new imaging studies of the spine and no evidence of any significant treatment for any spinal conditions other than two chiropractic visits in 2019" (Tr. 26 (citing chiropractor's records)) and, as Defendant's Memorandum points out (see Docket Entry 15 at 9), "[t]he only medication [Plaintiff] takes for pain is Acetaminophen" (Tr. 26). (See Docket Entry 12 at 9.) Moreover, in critiquing the ALJ's alleged "attempt[] to discount [Plaintiff's] credibility as to her degenerative disc disease" (id.), Plaintiff neither acknowledges that the ALJ gave Plaintiff "the benefit of the doubt and considered [Plaintiff's degenerative disc disease] when formulating [Plaintiff's RFC]" (Tr. 26) nor identifies any RFC limitation that the ALJ allegedly erroneously omitted based on her assessment of

16

Plaintiff's degenerative disc disease symptoms. (See Docket Entry 12 at 9.)

Plaintiff further contests the ALJ's statement that "'[Plaintiff] has been continuously counseled of the need to reduce her weight because it would provide significant symptom relief for most of her conditions. However, she has failed to comply with this medical advice.'" (Id. (quoting Tr. 26).) According to Plaintiff, the record does not support this finding. (See id.) To the contrary, the record repeatedly notes both Plaintiff's need to follow a healthy diet, lose weight, and exercise and her compliance issues with such diet, weight loss, and exercise. (See, e.g., Tr. 409, 425-26, 431, 538, 722, 860, 872, 884, 928, 1003, 1122, 1125-26.) Finally, Plaintiff contends that "the ALJ failed to explain why [Plaintiff's] complaints of fatigue were not credible, despite this being her most prolific symptom." (Docket Entry 12 at 9.) However, the ALJ did explain this finding, noting that "[r]ecords indicate that [Plaintiff] gets eight to twelve hours of sleep per night and is compliant with using her CPAP machine," as well as that Plaintiff "reported to Dr. Darji that she did not always feel refreshed after sleep, but she did not fall asleep during the day." (Tr. 28 (citing Ex. 5F p.1).)

In sum, the ALJ neither increased Plaintiff's burden of proof nor "reject[ed Plaintiff's subjective symptom] statements out of hand. Instead, [s]he compared them with the other evidence on the

17

record, including objective medical evidence and [Plaintiff's own] statements. The weight [the ALJ] assigned to [Plaintiff's] statements after comparing them with other evidence is therefore supported by substantial evidence." Ladda, 749 F. App'x at 171. Accordingly, Plaintiff's first assignment of error fails to justify reversal.

## 2. RFC Assessment

In her next assignment of error, Plaintiff contends that the ALJ applied an incorrect framework for assessing her RFC, including by expressing Plaintiff's RFC without first engaging in a function-by-function analysis; failed to adequately explain her findings; and failed to consider and include all of Plaintiff's limitations. (See Docket Entry 12 at 10-18.) These assertions fail to justify remand.

The RFC measures the most a claimant can do despite any physical or mental limitations. Hines, 453 F.3d at 562; 20 C.F.R. §§ 404.1545(a), 416.945(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms. See Hines, 453 F.3d at 562–63; 20 C.F.R. §§ 404.1545(b)-(d), 416.945(b)-(d). The ALJ then must match the claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very heavy). See 20 C.F.R. §§ 404.1567, 416.967. Any non-exertional limitations may further restrict a claimant's

18

ability to perform jobs within an exertional level.  <u>See</u> 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

An ALJ need not discuss every piece of evidence in making an RFC determination.  <u>See</u> <u>Reid v. Commissioner of Soc. Sec.</u>, 769 F.3d 861, 865 (4th Cir. 2014).  Nevertheless, "the ALJ must both identify evidence that supports [her] conclusion and build an accurate and logical bridge from that evidence to [her] conclusion." <u>Woods v. Berryhill</u>, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis, internal quotation marks, and brackets omitted).  As to the role of the function-by-function analysis in that determination, the relevant administrative ruling states:  "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis[] . . . .  Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."  SSR 96-8p at *1.  "[The Fourth Circuit] ha[s] explained that expressing the RFC before analyzing the claimant's limitations function by function creates the danger that the adjudicator will overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do."  <u>Monroe v. Colvin</u>, 826 F.3d 176, 187 (4th Cir. 2016) (internal quotation marks and brackets omitted).

19

Notably, the "[Fourth Circuit] ha[s] not adopted a rule of per se reversal for errors in expressing the RFC before analyzing the claimant's limitation function by function." Id. at 188; see also Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (explaining "that a per se rule is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are irrelevant or uncontested" (internal quotation marks omitted)). Instead, "remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Monroe, 826 F.3d at 188 (internal quotation marks omitted).

As an initial matter, Plaintiff asserts that the ALJ relied on an incorrect regulatory framework, arguing that, "just like in Dowling[ v. Commissioner of Social Security Administration, 986 F.3d 377 (4th Cir. 2021)]," the ALJ "based her [RFC] determination on SSR 16-3p and failed to cite to 20 C.F.R. § 416.945 or SSR 96-8p." (Docket Entry 12 at 11.) Contrary to Plaintiff's claims, the ALJ specifically cited to both 20 C.F.R. § 416.945 and SSR 96-8p in discussing the law applicable to the RFC determination. (See Tr. 21.) Moreover, unlike in the referenced decision, the ALJ's opinion "indicate[s] that h[er] RFC assessment was rooted in a function-by-function analysis of how [Plaintiff's] impairments impacted her ability to work," Dowling, 986 F.3d at 387, rather

20

than being "based entirely" on an analysis of whether "the alleged severity of [Plaintiff's] symptoms is supported by the record," id. (See, e.g., Tr. 27 ("Otherwise, there has not been any significant treatment of physical impairments during the relevant period. There is no evidence of any significant limitations in [Plaintiff's] ability to stand, walk, or sit. Consequently, the [ALJ] finds that [Plaintiff's] impairments and any exacerbating effects of her obesity warrant the limitations outlined above in the [RFC].").) Plaintiff's contentions on this front thus do not warrant remand.

Plaintiff also urges remand on the grounds that the ALJ "erroneously assessed [Plaintiff's] RFC by stating her RFC first, then identifying evidence and attempting to explain how it supported the ALJ's predetermined conclusion." (Docket Entry 12 at 13.) This alleged failure, Plaintiff contends, in and of itself necessitates vacating the ALJ's decision. (Id.) However, the mere failure to engage in a function-by-function analysis does not necessitate reversal, see Monroe, 826 F.3d at 188, and, as discussed below, no other deficiencies justify relief on this basis.

Plaintiff next contends that the ALJ "failed to build an accurate and logical bridge from the evidence to her conclusion." (Docket Entry 12 at 14.) More specifically, Plaintiff argues that "[t]he ALJ's discussion of the medical evidence does not explain

21

how this evidence supports her RFC findings." (Id. at 16.)
According to Plaintiff, "the ALJ's opinion should be vacated
because her lack of explanation frustrates meaningful review."
(Id.) In fact, the record establishes the opposite, as the ALJ's
detailed discussion of the evidence, including the medical
opinions, provides "an accurate and logical bridge" to her
conclusion that Plaintiff can engage in modified light work. (See
Tr. 25-28.)

For instance, the ALJ explained that the "persuasive" opinions
of Dr. Strobel-Nuss and Dr. Warren indicate that Plaintiff "had no
more than mild limitations in mental functioning and no severe
mental impairments." (Tr. 27.) She further explained that the
"somewhat less persuasive" opinion of Dr. Smith generally indicates

> that [Plaintiff] did not have any limitations and did not
> opine on the degree of limitation she had related to
> stress and pressure associated with day-to-day work,
> which makes his opinion somewhat vague. Nevertheless, no
> more than mild limitations are supported by and
> consistent with the objective medical evidence discussed
> above, which showed no psychiatric hospitalizations, only
> 12 sessions of outpatient counseling, unremarkable mental
> status exams, and good control of symptoms with common
> mental health medication.

(Tr. 27; see also Tr. 23-24 (analyzing mental health impairments
and explaining that "[Plaintiff] handles stress and changes in
routine well (4E p.7). [Dr. Smith] opined that [Plaintiff's]
ability to tolerate the stress and pressure associated with
day-to-day work was limited, but did not opine on the degree of

limitation (18F p.3). The objective medical evidence warrants no more than a mild limitation.").)

The ALJ further explained that Dr. Linster and Dr. Bessent "persuasive[ly ]opined that [Plaintiff] could perform a range of light work." (Tr. 27.) The ALJ observed that "[t]hese opinions are supported by and consistent with the objective medical evidence discussed above, which showed unremarkable physical exams with only one exam mentioning limited range of motion in the right shoulder. Additionally, her treatment consists entirely of routine follow-ups for medication refills and her symptoms are well managed." (Tr. 27.) The ALJ also noted that "[t]here have been no new imaging studies, no participation in physical therapy, no participation in pain management, and no recommendations for surgery." (Tr. 27-28.)

The ALJ then discussed the opinion of Dr. Darji, the results of which the ALJ had earlier analyzed. (See Tr. 27-28.) As the ALJ explained:

> The examination was grossly unremarkable and noted that [Plaintiff's] concentration was good, she had a steady symmetric gait, and did not require and assistive device for ambulation (5F p.4). She had no palpable muscle spasms and muscle strength and range of motion were normal throughout (5F pp.4, 6). Straight leg raising was negative and sensation to light touch was intact throughout (5F p.4). She was able to lift, carry, handle, and manipulate light objects (5F p.5). She was able to squat and rise with ease (id.). She was able to rise from a sitting position without difficulty and did not require assistance getting off the exam table (id.). She walked on her heels and toes with ease (id.). Tandem walking was normal and she was able to hop on one foot at a time bilaterally (id.).

23

(Tr. 27.)  The ALJ found Dr. Darji's opinion "somewhat persuasive," explaining that "Dr. Darji opined that based on his examination, there was not enough evidence to state any functional limitations." (Tr. 28.)  Nevertheless, "[b]ased on other evidence discussed [in the ALJ's opinion], the [ALJ gave Plaintiff] the benefit of the doubt and assigned the limitations outlined above in the [RFC]. The [RFC] . . . more than adequately accommodates any limitations that [Plaintiff] may have."  (Tr. 28.)

Finally, the ALJ explained why she found Dr. Dohmeier's opinion "unpersuasive" and fatigue-related RFC restrictions unwarranted.  (Tr. 28 (citing Ex. 16F); see also Tr. 23.) Specifically, the ALJ noted that Dr. Dohmeier "opined that [Plaintiff's] sleep apnea caused severe daytime somnolence that was severe enough to prevent work, but also acknowledged that this was based entirely on [Plaintiff's] own subjective report."  (Tr. 28.) The ALJ continued:

> Records indicate that [Plaintiff] gets eight to twelve hours of sleep per night and is compliant with using her CPAP machine.  [Plaintiff] reported to Dr. Darji that she did not always feel refreshed after sleep, but she did not fall asleep during the day (5F p.1).  Dr. Dohmeier essentially just recited the claimant's subjective complaints and did not offer any supporting evidence or rationale for her opinion.  Additionally, the statements relating to the claimant's ability to work, are issues reserved to the Commissioner and consequently, no analysis is required because the statement is inherently neither valuable nor persuasive (20 CFR 404.1520B.(c) and 416.920b.(c)).

(Tr. 28.)[8]

Thus, the ALJ sufficiently explained why the medical opinions supported her modified light work RFC determination. See Ladda, 749 F. App'x at 172 (explaining that, "[i]n *Monroe*, an ALJ's RFC assessment was not supported by substantial evidence when he failed to explain his decision to rely on certain medical records while ignoring others and when he failed to include a narrative discussion describing how he decided to weigh the evidence," but that, "the ALJ sufficiently explained his conclusions when conducting the RFC assessment" in Ladda because he "used evidence from the record to explain his finding that [the claimant] was capable of light work," precluding remand); cf. Monroe, 826 F.3d at 190-91 (finding ALJ's explanation necessitated remand where ALJ (1) failed to specify what evidence he found undermined medical

_____

[8] Significantly, Dr. Dohmeier's own evaluation of Plaintiff, conducted in June 2019 with the stated intent from Plaintiff of "assistance with disability" (Tr. 767; see also Tr. 768 ("Trying to get disability – working with a lawyer – needs sleep specialist to help with that")), provides record support for the ALJ's finding that Plaintiff receives eight to twelve hours of sleep and remains compliant with her CPAP machine. (See, e.g., Tr. 767-69, 774; see also Tr. 23 (citing, inter alia, Ex. 13F (i.e., Dr. Dohmeier's June 2019 records) for support of sleep-related findings).) Dr. Dohmeier's notes from that evaluation reflect that, based on her assessment of Plaintiff, Dr. Dohmeier "see[s] no way to provide [sic] disability for a hypersomnia sleep disorder – not enough organic abnormalities while on CPAP." (Tr. 774.) Nevertheless, Dr. Dohmeier's December 2019 opinion (see Tr. 1036) reflects that Dr. Dohmeier's last contact with Plaintiff occurred in June 2019; that Plaintiff suffered from "[h]ypersomnia[;]" that, "by Pt Report," Plaintiff suffers from "[s]evere" excessive daytime somnolence sufficient to prevent work; and that, "per subjective report," Plaintiff's impairments lasted or could be expected to last for at least twelve months. (Tr. 1035.) Notwithstanding these subjective reports, the opinion provides no answers in the section asking for Dr. Dohmeier's estimates regarding any functional limitations on Plaintiff's abilities in a competitive work situation, including any need to take unscheduled breaks (associated with chronic fatigue or any other reason, including "[a]dverse effects of medication"), any days missed from work, or any time "off task." (Tr. 1035-36 (emphasis omitted).)

25

opinions indicating need for limitations and (2) "gave similarly conclusory analysis of other opinions," such as by stating only that "'[t]he [ALJ] gives the consultative examiner's findings some weight, to the extent that it is consistent with the [RFC],'" and that "'[t]he consultative examiner's opinion is supported by the objective evidence,'" explaining that, "[w]ithout more specific explanation of the ALJ's reasons for the differing weights he assigned various medical opinions, neither [the Fourth Circuit] nor the district court can undertake meaningful substantial-evidence review").

Plaintiff contends, though, that

> [t]his case is like *Monroe* because here, the ALJ failed to assess [Plaintiff's] capacity to perform relevant functions, despite contradictory evidence in the record. TR 25-28; 826 F.3d at 188. For example, the ALJ's assigned RFC provides for frequent operation of hand controls bilaterally; frequent pushing or pulling with the right upper extremity; frequent reaching overhead and in all directions with the right upper extremity; and frequent handling with the right upper extremity. TR 25. However, the ALJ failed to explain how [Plaintiff] can perform work five days per week, eight hours per day that requires such frequent operation of hand controls, pushing, pulling, reaching and handling with the right upper extremity, when [Plaintiff] suffers from osteoarthritis of the right upper extremity, which causes her severe pain, limited range of motion, and inhibits her ability to do household chores. TR 63, 317, 670, 673-74, 765.

(Docket Entry 12 at 17-18.)[9]

---

[9] Plaintiff does not specify any other functions that the ALJ allegedly failed to assess. (See id. at 10-18.)

This contention entitles Plaintiff to no relief, because, as discussed above, the ALJ thoroughly examined the impact of Plaintiff's osteoarthritis on her ability to function. (See Tr. 26-27.) The ALJ further found persuasive the State Agency medical consultants' opinions (see Tr. 27), which determined that, although Plaintiff suffered from some push/pull limitations in both upper extremities and her right lower extremity, she could "[f]requent[ly] push/pull," which "includ[ed] operation of hand and/or foot controls" (Tr. 97, 115, 135, 153). They further found that, despite limitations on Plaintiff's ability to reach with her right arm and engage in handling (i.e., gross manipulation) with either arm, she remained subject to only "[f]requent manipulative limitations." (Tr. 98, 116, 136, 154.) The ALJ also observed that Dr. Darji "opined that based on his examination, there was not enough evidence to state any functional limitations," but that the ALJ gave Plaintiff "the benefit of the doubt and assigned the limitations outlined" in the RFC (Tr. 28), including those that Plaintiff now challenges. In any event, requesting further explanation as to the osteoarthritis-impacted functions highlighted by Plaintiff would not alter the outcome in this case, given that the finding of no disability turned on Plaintiff's ability to "perform[] past relevant work as a[n] . . . operations research analyst (DOT# 020.067-018. . .)" (Tr. 28), which does not involve frequent reaching or handling, see Dictionary of Occupational

27

_Titles_, Operations-Research Analyst, 1991 WL 646468 (4th ed. rev. 1991); _see also_ _Fisher v. Bowen_, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

Plaintiff additionally contends that the ALJ, without explanation, "failed to provide for any limitations due to [Plaintiff's] significant fatigue, depression, anemia, poorly controlled blood pressure, side effects from medications such as drowsiness, diabetic retinopathy of the left eye, sleep apnea and hyper-somnolence, and hyperthyroidism." (Docket Entry 12 at 18.) As a preliminary matter, the State Agency medical consultants considered, _inter alia_, Plaintiff's chronic kidney disease, depression, fatigue, pain, hypertension, diabetes, sleep-related breathing disorders, chronic respiratory disorders (_see, e.g._, Tr. 110-12, 131, 133), thyroid disorders, and visual impairment (_see, e.g._, Tr. 131, 133) in reaching their determination that Plaintiff could engage in modified light work. They also specifically identified, _inter alia_, Plaintiff's chronic fatigue, diabetes, chronic kidney disease, and blood pressure as justification for their recommended functional limitations (_see, e.g._, Tr. 115, 135), which the ALJ adopted (_see_ Tr. 25). Similarly, the ALJ explained that she considered persuasive the State Agency psychological

28

consultants' opinions, which found that Plaintiff "had no more than mild limitations in mental functioning and no severe mental impairments." (Tr. 27.) The ALJ also explained the issues with Dr. Smith's "somewhat vague" opinion, which "generally opined that the claimant did not have any limitations and did not opine on the degree of limitation she had related to stress and pressure associated with day-to-day work." (Tr. 27.) The ALJ then detailed why the evidence supported "no more than mild limitations" on that front. (Tr. 27.)

As discussed previously, the ALJ also specifically analyzed the evidence regarding Plaintiff's kidney disease and fatigue. (See Tr. 26, 28.) The ALJ additionally evaluated Plaintiff's "hypertension, diabetes, sleep related breathing disorders, and mild vision loss," explaining why they qualified as "non-severe impairments" and "no more than minimally affect [Plaintiff's] ability to perform basic work related activities." (Tr. 23.) In this regard, the ALJ stated:

> The record indicates that these impairments either were acute illnesses, lasting for less than 12 months, or are well controlled on medication. These impairments no more than minimally affect [Plaintiff's] ability to perform basic work related activities. All objective studies, such as physical exams, lab work, and imaging studies related to these impairments were unremarkable or within normal limits (4F, 5F, 7F, 13F, 15F p.206, 17F). She has good control of her sleep apnea with a CPAP machine and downloads indicated eight hours of use per night (*id.*). Records indicate her diabetes is well controlled and she does not check her blood sugar at home (*id.*). Recent lab work indicated an A1C of 6.0, which is consistent with good control for adults with diabetes (19F pp.18-19).

29

> Visual acuity with corrective lenses was 20/30 in each
> eye individually and 20/20 in both eyes (5F p.3).
> Additionally, she has been advised to restrict her diet,
> lose weight, and exercise. Consequently, the [ALJ] finds
> that these impairments are non-severe. The [ALJ]
> considered all of the claimant's medically determinable
> impairments, including those that are not severe, when
> assessing [Plaintiff's RFC].

(Tr. 23.) Finally, as discussed below, the ALJ analyzed Plaintiff's depression (<u>see</u> Tr. 23-24), finding that it "does not cause more than minimal limitation in [her] ability to perform basic mental work activities and is therefore non-severe" (Tr. 23).

Thus, Plaintiff errs in asserting both that the ALJ "failed to provide for any limitations" regarding these medical issues and that the ALJ failed to explain why she declined to impose additional limitations on those fronts. (Docket Entry 12 at 18.) Here, the ALJ "addressed conflicting evidence in the record," <u>Ladda</u>, 749 F. App'x at 173, and "used evidence from the record to explain [her] finding that [Plaintiff] was capable of [modified] light work," <u>id.</u> at 172. Accordingly, the Court should "uphold the ALJ's RFC assessment as supported by substantial evidence rather than remand." <u>Id.</u> at 173.

### 3. Special-Technique Assessment

In her final assignment of error, Plaintiff contends that, "like in *Patterson*[ *v. Commissioner of Social Security Administration*, 846 F.3d 656 (4th Cir. 2017)], the ALJ failed to properly document the special technique assessment." (Docket Entry 12 at 19; <u>see also</u> <u>id.</u> at 18.) The special-technique assessment

30

governs an ALJ's evaluation of a claimant's alleged mental impairments at steps one through four of the SEP. See Patterson, 846 F.3d at 659. As the Fourth Circuit has explained:

> Under the special-technique regulation, if the ALJ determines that a mental impairment exists, he "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [his] findings." [20 C.F.R.] § 404.1520a(b)(1). The ALJ must also document "a specific finding as to the degree of limitation in each of" the four areas of functional limitation listed in § 404.1520a(c)(3). Id. § 404.1520a(e)(4). . . . Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment. Id. § 404.1520a(d). If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities. See id. § 404.1520a(d)(3). The regulation specifically provides that the ALJ must document all of the special technique's steps. Id. § 404.1520a(e)(4).

Patterson, 846 F.3d at 659.

Here, Plaintiff concedes that the ALJ "rate[d Plaintiff's] four areas of functional limitation listed in § 404.1520a(c)(3)." (Docket Entry 12 at 19.)[10] Plaintiff maintains, though, that "the ALJ failed to adequately explain how she weighed all relevant evidence and how she reached her conclusions about the severity of the mental impairment." (Id.) In particular, Plaintiff faults the ALJ for "only cit[ing] to one medical record," namely Dr. Smith's

---

[10] In light of that concession, Patterson lacks applicability to this case. See Patterson, 846 F.3d at 660 ("The SSA concedes that the ALJ did not document application of the special technique in reaching [his RFC and disability] findings, or explicitly adopt physician findings that could possibly qualify alone as a surrogate for the special-technique assessment.").

opinion (id.),[11] and disputes the ALJ's findings that Plaintiff's mental exams qualified as unremarkable and that her symptoms remained "well managed with her medication" (id. at 21 (internal quotation marks omitted)). Plaintiff further faults the ALJ for allegedly "fail[ing] to explain how she considered evidence of [Plaintiff's] testimony and evidence contained in her function report." (Id.)

Contrary to Plaintiff's contentions, the ALJ provided a thorough explanation regarding her assessment of Plaintiff's mental impairments and their effect on her RFC. (See Tr. 23-27.) For instance, the ALJ determined that Plaintiff experienced no limitation in the first functional area (understanding, remembering, and applying information). (Tr. 23.) As support for this conclusion, the ALJ explained that Plaintiff possesses a "master's degree with a focus in technical writing and operations management," as well as a "spontaneous and well organized" stream of mental activity, perfect recall, an adequate fund of information, and above-average estimated intellectual functioning. (Tr. 23.) The ALJ further noted that "[t]he psychological consultative examiner opined that the claimant's ability to understand, retain, and follow instructions was not limited." (Tr. 23.) The ALJ next found that Plaintiff experiences a mild limitation in the "interacting with others" functional area. (Tr.

---

[11] This argument overlooks the ALJ's citation to the records involving Plaintiff's 2018 counseling sessions. (See Tr. 24 (citing Ex. 8F).)

23.) As support for this finding, the ALJ explained that Plaintiff (1) displayed good cooperation and attitude, (2) reported receiving assistance with her living expenses from friends and church, (3) reported getting along well with coworkers, and (4) attended church and sang in the choir each week, although she stated that she found it exhausting. (Tr. 23 (citing, <u>inter alia</u>, Plaintiff's function report).) The ALJ further noted that "[t]he psychological consultative examiner opined that [Plaintiff's] ability to relate with coworkers and supervisors was not limited." (Tr. 23.)

The ALJ similarly found that Plaintiff experiences a mild limitation in the third functional area of "concentrating, persisting or maintaining pace." (Tr. 23.) In this regard, the ALJ noted that Plaintiff "reported some difficulty focusing on her job," but "did not exhibit involuntary movements" (Tr. 23) and "was alert and oriented in all spheres" and "able to correctly perform serial sevens" with a "reasonable" "ability to sustain concentration and attention" (Tr. 23-24). The ALJ also observed that "[t]he psychological consultative examiner opined that [Plaintiff's] ability to sustain attention for performing simple, repetitive tasks for brief periods was not limited." (Tr. 24.) Finally, the ALJ determined that Plaintiff experiences a mild limitation in the fourth functional area (adapting and managing oneself). (Tr. 24.) The ALJ explained that:

> [Plaintiff] drove herself to the evaluation and arrived on time (18F p.1). Her overall appearance, grooming, and

33

personal hygiene were good (*id.*). She reported
difficulty sleeping (*id.*). Generally, she has no
problems performing personal care activities other than
a lack of motivation and energy to take care of her
appearance (*id.*). She prepares her own meals daily (4E
p.3). She performs household chores, such as cleaning,
laundry, and taking out the trash (*id.*). She can drive
and she shops for groceries and household items twice a
week (4E p.4). She handles stress and changes in routine
well (4E p.7). The psychological consultative examiner
opined that the claimant's ability to tolerate the stress
and pressure associated with day-to-day work was limited,
but did not opine on the degree of limitation (18F p.3).
The objective medical evidence warrants no more than a
mild limitation.

(Tr. 24.)

As such, the ALJ determined:

    [Plaintiff] has no more than mild limitations in
mental functioning. She has never been hospitalized for
psychiatric or mental health issues (18F p.1). She
participated in 12 sessions of counseling during 2018 and
then stopped because she could not afford it (8F). There
is no evidence of ongoing participation in outpatient
counseling. She reported being prescribed Escitalopram
(Lexapro), a common mental health medication, by a
primary care provider (12E). Mental status exams were
unremarkable throughout the record and records suggest
that her symptoms are well managed with her medication.
Because [Plaintiff's] medically determinable mental
impairment causes no more than "mild" limitation in any
of the functional areas and the evidence does not
otherwise indicate that there is more than a minimal
limitation in the claimant's ability to do basic work
activities, it is non-severe (20 CFR 404.1520a(d)(1) and
416.920a(d)(1)).

(Tr. 24.)

    Observing that the foregoing analysis addressed only the

severity of Plaintiff's mental health impairments, the ALJ then

noted that the mental health RFC assessment "require[d] a more

detailed assessment." (Tr. 24.) As discussed above, in conducting

34

that assessment, the ALJ analyzed the opinions of the psychological consultants and noted that Plaintiff displayed good concentration during her 2018 physical consultative examination. (See Tr. 27.) The ALJ also explained that "[Plaintiff] worked throughout the relevant period and continues to work part-time[ and] reported that one of her daily activities is to look for work." (Tr. 25 (citing Plaintiff's function report).) The ALJ further noted that, "[g]enerally, [Plaintiff] has no problems performing personal care activities other than a lack of motivation and energy to take care of her appearance," and that Plaintiff engages in a variety of household chores and social activities. (Tr. 26 (citing Plaintiff's function report).) In addition, the ALJ observed that, by her own admission, "[Plaintiff] can pay attention for an hour without problems and usually finishes what she starts" and also "follows instructions well." (Tr. 26 (citing Plaintiff's function report).) Finally, the ALJ noted that medical records describe Plaintiff as "delightful." (Tr. 26.)

In sum, contrary to Plaintiff's position, the ALJ "adequately explain[ed] how she weighed all relevant evidence and how she reached her conclusions about the severity of the mental impairment" (Docket Entry 12 at 19). Nevertheless, Plaintiff contends that the ALJ erred in her findings regarding Plaintiff's mental health examinations and the control of her symptoms via medication. (See id. at 21 (citing Tr. 653, 669, 673, 709, 712,

35

1104).)  However, even those citations reflect that, <u>inter alia</u>,
Plaintiff's "[d]epression [is] managed with escitalopram," without
any "adverse effects," and that, although Plaintiff "[r]eports that
her mood is down, depressed[, she f]eels that this a situational
depression, [as she] works with a temp agency[ and] lost an
opportunity to obtain a permanent job and has difficulty with the
stress of looking for a secure job." (Tr. 653.)  The most recent
of the cited medical records, from February 12, 2019, assess her
"[m]ood, memory, affect and judgment [as] normal," explaining that
she appeared "[t]earful at time[s] when her situation is discussed
but she is most of the time [normal] — not wanting to increase her
depression medications — she feels like her mood decrease is mostly
situational and she is working on her situation." (Tr. 1104-05.)
Other records during the relevant time period likewise describe
Plaintiff as possessing "a normal mood and affect" with "normal"
behavior.  (Tr. 798; <u>accord, e.g.</u>, Tr. 752, 1052, 1089.)
Additionally, although Plaintiff's treating therapist in 2018
initially diagnosed Plaintiff as "severely depressed" (Tr. 709),
her records indicate that during the sessions Plaintiff "was
feeling better about things" (Tr. 717) and, by the end of the
allotted sessions, the therapist had "obeserv[ed Plaintiff make]
progress" on her goals of "mood management and confidence-
building." (Tr. 732.)  As such, the ALJ did not reversibly err in
her findings regarding Plaintiff's mental health exams and

36

symptoms. See Ladda, 749 F. App'x at 172 (explaining that courts "look to whether the ALJ's decision was supported by substantial evidence, and in doing so, '[courts] do not undertake to reweigh . . . [the] evidence'" (ellipsis and final set of brackets in original); Craig, 76 F.3d at 589 (explaining that, "[u]nder the [Act, courts] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard").

Put simply, the ALJ appropriately conducted the special-assessment technique and substantial evidence supports her findings. Under the circumstances, Plaintiff has failed to demonstrate entitlement to relief on the basis of the mental RFC.

### III. CONCLUSION

Plaintiff has established no grounds for relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Summary Judgment (Docket Entry 11) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 14) be granted, and that this case be dismissed with prejudice.

This 23rd day of February, 2022.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

37